UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


R. Todd Sterling,                                          Case No. 3:19-cv-2993

        Plaintiff,

    v.                                                   MEMORANDUM OPINION
                                     AND ORDER

Experian Information Solutions, Inc., *et al.*,

        Defendants.


## I.    INTRODUCTION AND BACKGROUND

On December 17, 2019, Plaintiff R. Todd Sterling filed a *pro se* Complaint in the Allen

County, Ohio Court of Common Pleas seeking monetary damages, a 50-point addition to his credit

score, and an order from the court requiring the use of a single credit score computation model.

(Doc. No. 1-2 at 4-5).  Defendant Trans Union, LLC removed the matter to this court based on

federal question jurisdiction because Sterling's Complaint alleged claims under the Fair Credit

Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA").  (Doc. No. 1).

On June 15, 2021, Defendant Experian Information Solutions, Inc. ("Experian") filed a

motion to dismiss under Rule 12(b)(6).  (Doc. No. 73).  In response, Sterling filed a motion for leave

to file an Amended Complaint.  (Doc. No. 74).  Experian opposed Sterling's request for leave to

amend the Complaint, (Doc. No. 75), and Sterling replied.  (Doc. No. 76).

### A.  Overview of Credit Scoring

Credit scoring is a system used to determine an individual's eligibility for credit cards, insurance policies, certain services, loans, or mortgages.[1]  Essentially, it represents how likely an individual is to make timely payments or repay the loan.[2]  The score is calculated based upon information in the credit file such as: an individual's repayment history, the types of loans taken out, total debt owed, and the length of time the individual has retained lines of credit.[3]  But requests for certain types of loans may require review of additional information not contained in the credit file; for example, applications for mortgages may consider annual income or the amount of down payment available.[4]

These credit files are maintained by consumer reporting agencies, who then provide "consumer reports" (commonly called "credit reports") to third-party companies upon request.  *See* 15 U.S.C. § 1681a(f).  Experian, Equifax, and Trans Union are all consumer reporting agencies who assemble separate credit files based upon the information reported to them by third parties.[5, 6]  Because these credit files are dependent on outside reporting, each company's credit file may contain different data which may ultimately affect the credit score.[7]

---

[1] *Credit Scores*, Fed. Trade Comm'n, Consumer Info., https://www.consumer.ftc.gov/articles/credit-scores (last updated May 2021).

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] *See* Louis DeNicola, *When is a Credit File Created?,* Experian (May 4, 2020), https://www.experian.com/blogs/ask-experian/when-is-a-credit-file-created/.

[6] Nationwide consumer reporting agencies, like Experian, are not the only consumer reporting agencies; others exist to service certain business sectors and/or specific needs, such as insurance or rental companies, or background check agencies.  *See generally* Consumer Financial Protection Bureau, *List of Consumer Reporting Companies* (Jan. 2020), https://files.consumerfinance.gov/f/documents/cfpb_consumer-reporting-companies-list.pdf.

[7] DeNicola, *supra.  See also Standfacts Credit Servs., Inc. v. Experian Info. Sols., Inc.*, 405 F.Supp.2d 1141, 1159 (C.D. Cal. 2005) ("[N]o two credit reports, even of the same customer, are identical.  Each report is created by collecting and sorting tens of thousands of data points, including information regarding a previously generated credit report.").

But a consumer's credit score is not only a reflection of the credit file's contents; scores also depend on the timing of the request and the scoring model (i.e., mathematical formula) used.[8]  There are multiple commercial credit scoring models available as well as custom-made scoring models used only by particular institutions.[9]  Most consumers are familiar with their FICO score but this is an oversimplified misnomer – actually, there over 28 different FICO scoring models that can be used depending on the credit product at issue.[10]  For example, the FICO scoring model used when applying for a home mortgage may be different than that relied upon if the consumer applies for a credit card.[11]  These various scoring models reflect that different industries place importance on different risk factors. [12]  These risks are quantified by weighing the core factors in the credit file (i.e., payment history, credit utilization, age of credit accounts etc.) differently depending on which factors best reflect the individual's likelihood of repaying that particular credit or loan request.[13]

---

[8] *See You have many different credit scores*, CFPB, https://files.consumerfinance.gov/f/documents/201702_cfpb_credit-score-explainer.pdf (last accessed July 21, 2021).

[9] *See* CFPB, *Key Dimensions and Processes in the U.S. Credit Reporting System,* 12 (December 2012), https://files.consumerfinance.gov/f/201212_cfpb_credit-reporting-white-paper.pdf ("Additionally, the NCRAs and other third-party development companies develop both generic and custom scoring models. Many lenders also develop and use proprietary scoring models derived from credit report information.").

[10] *See FICO Scores Versions*, myFICO, https://www.myfico.com/credit-education/credit-scores/fico-score-versions (last visited July 21, 2021).

[11] *Id.*

[12] *See* FDIC -Div. of Supervision and Consumer Protection, *Risk Management Examination Manual for Credit Card Activities*, 51 (March 2007), https://www.fdic.gov/regulations/examinations/credit_card/pdf_version/ch8.pdf ("Scoring models are developed by analyzing statistics and picking out cardholders' characteristics thought to be associated with creditworthiness.  There are many different ways to compress the data into scores, and there are several different outcomes that can be modeled.").  *See also How are Credit Scores Calculated?*, Equifax, https://www.equifax.com/personal/education/credit/score/how-is-credit-score-calculated/ (last visited July 21, 2021).

[13] *See* Megan DeMatteo, *This is the credit score lenders use when you apply for a mortgage*, CNBC (Dec. 2, 2020), https://www.cnbc.com/select/which-credit-score-used-when-applying-for-mortgage/ ("The FICO 8 model is known for being more critical of high balances on revolving credit lines.  Since revolving credit is less of a factor when it comes to mortgages, the FICO 2, 4 and 5 models, which put less emphasis on credit utilization, have proven to be reliable when evaluating good candidates for a mortgage.").

Importantly, when a consumer views or purchases a credit score "it is likely that the credit score that the consumer receives will not be same score as that purchased and used by a lender to whom the consumer applies for a loan."[14] This difference may be attributable to many factors, including the lenders' option to use whatever scoring model it chooses.[15] Consumer reporting agencies offer lenders multiple scoring models for purchase based on the type of credit or loan for which the consumer applied.[16] It is also possible for lenders to purchase a consumer report from a consumer reporting agency but then apply its own custom scoring model to the data contained within the consumer report.[17] Thus, an individual's credit score depends on the contents of their credit file, the type of credit or loan for which the consumer applied, when the consumer report is purchased, and the scoring model selected by the creditor or lender to whom they applied.

### B. Overview of the FCRA

The FCRA's purpose is to require consumer reporting agencies to adopt reasonable procedures that are fair and equitable to consumers regarding confidentiality, accuracy, relevancy, and proper utilization of consumer credit information. 15 U.S.C. § 1681(b). In essence, the FCRA establishes industry-wide procedures that must be followed when assembling consumer information and communicating that information to others. The FCRA applies to consumer reporting agencies, furnishers of information (such as a consumer's existing lender), and the users of consumer credit information (such as a consumer's potential lender). *See* §§ 1681g, 1681m & 1681s-2.

Under the statute, the main responsibilities of consumer reporting agencies are to ensure accuracy of consumer reports, provide consumer reports only for permissible purposes, and reasonably investigate consumer disputes regarding reported information. *See* §§ 1681b, 1681c,

---

[14] CFPB, *Report to Congress on Credit Scores: The impact of differences between consumer- and creditor-purchased credit scores*, 1 (July 9, 2011), https://files.consumerfinance.gov/f/2011/07/Report_20110719_CreditScores.pdf.
[15] *Id.* at 4-5.
[16] *Id.*
[17] *Id.*

1681e, 1681i.  They are also required to provide disclosures to consumers about their statutory rights under the FCRA and the contents of their credit files.  §§ 1681g & 1681h.  Like consumer reporting agencies, furnishers of information must provide accurate and complete information, and investigate consumer disputes regarding the accuracy of furnished information.  § 1681s-2.  Users of information are responsible for obtaining consumer reports only for permissible purposes and providing specific notices to consumers if it takes adverse action based on the information in the consumer report.  § 1681m.

The FCRA does not mandate the use of a specific credit scoring model.  The statute defines "credit score" as "a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors . . . ."  § 1681g(f)(2)(A)(i).  This definition tacitly acknowledges the realities of credit scoring - mainly that there are multiple tools and models used to calculate credit scores.  The fact that Congress contemplated this reality is underscored by the FCRA's disclosure mandate, requiring "a statement indicating that the information and credit scoring model may be different than the credit score that may be used by the lender[,]" anytime a consumer requests their credit score from a consumer reporting agency.  § 1681g(f)(1).

The statute also makes clear that consumer reporting agencies are not responsible for any adverse actions taken by lenders based off the consumer report.  § 1681m(a)(3)(B) (users must provide consumers with "a statement that the consumer reporting agency did not make the decision to take the adverse action and is unable to provide the consumer the specific reasons why the adverse action was taken . . .").  Thus, the FCRA provides a procedural framework for entities operating in the credit industry but it does not provide consumers an alternate path to recovery in the event of an adverse decision by a lender.

### C.  Factual Background

Sterling's Complaint named consumer reporting agencies Experian, Trans Union LLC, Equifax Information Services LLC, and Credit Karma, Inc.  (Doc. No. 1-2).  Service was timely completed on all Defendants except for Experian.  On March 29, 2021, Sterling moved for default judgment against Experian, (Doc. No. 57), but I denied the motion because Sterling had failed to properly serve Experian.  (Doc. No. 59).  Experian was finally served with the Complaint on May 4, 2021, (Doc. No. 64), more than a year after the deadline for amending the pleadings established in the case management order and only shortly before the close of discovery.  (*See* Doc. No. 20; Non-document Order of December 15, 2020).  Defendants Trans Union, Equifax, and Credit Karma were dismissed with prejudice following settlements with Sterling.  (*See* Doc. Nos. 51, 58, & 66).  Experian is the sole remaining Defendant.

Sterling's Complaint arises from the denial of an application for a home mortgage.  (Doc. 1-2 at 2-4).  Approximately four years ago, Sterling began working to repair his low credit rating.  (*Id.* at 2).  Throughout this period, he opened multiple credit lines and alleges he maintained a "perfect payment history," which resulted in positive changes to his credit score.  (*Id.* at 2-3).  On September 30, 2019, Sterling's credit score was reported as 624 by Credit Karma, and 621 by Trans Union and Equifax.  (*Id.* at 3).  That same week, he initiated an application for a VA home mortgage loan with his local Huntington Bank.  (*Id.*).  Huntington Bank conducted a credit check and purchased scores of 589 from Experian, 585 from Trans Union, and 570 from Equifax.  (*Id.*).  Subsequently, Sterling purchased credit score monitoring from both Experian and Trans Union, who both reported scores of 621.  (*Id.* at 3-4).  Sterling was ultimately denied the mortgage loan by Huntington Bank.  (*Id.* at 2).

Sterling alleges the consumer reporting agencies are engaged in a fraudulent scheme to prevent certain "undeserving" customers from obtaining financing.  (*Id.* at 4).  As examples of this scheme, Sterling alleges the consumer reporting agencies: do not diligently update customer activity

or scores, intentionally report false scores to increase usage of certain credit cards or credit monitoring programs owned by the consumer reporting agencies, commit theft when the consumer reporting agencies accept monthly fees for ineffective credit monitoring, maintain a "secret list of people blackballed due to prior credit mistakes," and "intentionally sabotage" consumers by reporting "soft scores" online but "hard scores" to financial institutions. (*Id.*).

Sterling's Complaint has been liberally interpreted as raising claims for violation of the FCRA and common-law fraud. (*See* Doc. No. 1-2; Doc No. 54 at 3, fn.2) *but see Pliler v. Ford*, 542 US. 225, 231 (2004) (District courts "have no obligation to act as counsel or paralegal to *pro se* litigants.").

## II. STANDARD

Rule 12 provides for the dismissal of a lawsuit for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), "even though a complaint need not contain 'detailed' factual allegations, its 'factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true.'" *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The plaintiff must offer more than conclusory allegations or legal conclusions masquerading as factual allegations. *Twombly*, 550 U.S. at 555 (The complaint must contain something more than "a formulaic recitation of the elements of a cause of action."). A complaint must state sufficient facts which, when accepted as true, state a claim "that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully" and requires the complaint to allow the court to draw the reasonable inference that the defendant is liable for the alleged misconduct). In the case of a *pro se* litigant, courts will construe their pleadings liberally but "[l]iberal construction does not require a

court to conjure allegations on a litigant's behalf." *Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004) (quoting *Erwin v. Edwards*, 22 F.App'x 579, 580 (6th Cir. 2001)).

Because Sterling states allegations of fraud, Rule 9(b)'s heightened pleading standard applies. Fed. R. Civ. P. 9(b). Rule 9(b) requires a plaintiff: "(1) to specify the allegedly fraudulent statements; (2) to identify the speaker; (3) to plead when and where the statements were made; and (4) to explain what made the statements fraudulent." *Republic Bank & Trust Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239, 247 (6th Cir. 2012). This heightened pleading requirement applies to all fraud claims, including those brought by *pro se* plaintiffs. *See, e.g., Tucker v. U.S. Bank, N.A.*, No. 1:13CV1260, 2014 WL 1224362, at *3 (N.D. Ohio Mar. 24, 2014) ("The fact that Plaintiff is proceeding pro se does not relieve him from his duty to meet the minimal requirements for alleging fraud."); *McGowan v. Ditech Fin.*, No. 1:18cv270, 2018 WL 2364932, at *2 (N.D. Ohio May 23, 2018).

## III. ANALYSIS

### A. FCRA Claim

Sterling's Complaint has been construed as making a claim for relief under § 1681e(b) which requires consumer reporting agencies to "follow reasonable procedures to assure maximum possible accuracy of the information" contained in the consumer report. 15 U.S.C. § 1681e(b). A "consumer report" is any communication by a consumer reporting agency bearing on the consumer's credit worthiness or credit standing. § 1681a(d)(1). Importantly, a consumer report is one furnished *to a third party* for the purpose of evaluating authorized credit, insurance, or employment decisions. *See* § 1681a(f); *see also Brown v. Wal-Mart Stores, Inc.*, 507 F. App'x 543, 546 (6th Cir. 2012); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1335 (11th Cir. 2015) ("A 'consumer report' requires communication *to a third party,* while a 'file' does not."); *Sgouros v. Transunion Corp.*, No. 14 C 1850, 2016 WL 4398032, at *4 (N.D. Ill. Aug. 18, 2016) ("Because no *third party* ever received that score, it is not considered a 'consumer report[.]'") (emphasis added).

8

To succeed on his § 1681e(b) claim, Sterling must prove: "(1) [Experian] reported inaccurate information about [him]; (2) [Experian] either negligently or willfully failed to follow reasonable procedures to assure maximum possible accuracy of the information about [him]; (3) [he] was injured; and (4) [Experian]'s conduct was the proximate cause of [his] injury." *Nelski v. Trans Union, LLC*, 86 F. App'x 840, 844 (6th Cir. 2004).

The Complaint alleges a single instance of Experian issuing a consumer report to Huntington Bank on September 30, 2019, (Doc. No. 1-2 at 3); yet Sterling does not allege anything about this consumer report was inaccurate per se. He notes the "drastic difference" between his online Experian credit score, 621, and the score Huntington Bank purchased from Experian, 589. (*Id.*). But the "drastic difference" between the scores does not show that the 589-score furnished to Huntington Bank in the "consumer report" was inaccurate. As discussed above, multiple models are used to calculate credit scores. It is clearly stated on the landing page of Experian's website: "Your lender or insurer may use a different FICO Score than FICO Score 8, or another type of credit score altogether."[18] Yet, the Complaint lacks any allegation regarding the scoring model Huntington Bank utilized to evaluate Sterling's application. Thus, it is impossible to determine from the face of Sterling's Complaint whether any "drastic difference" resulted from improper calculation (and is therefore, inaccurate) or merely resulted from the use of different scoring models.

Remaining are Sterling's conclusory allegations of industry-wide fraudulent score calculations. (*See* Doc. No. 1-2 at 3-4). But these conclusory allegations are not sufficient to establish inaccuracy for purposes of § 1681e(b). *See, e.g., McComas v. Experian Info. Sols., Inc.,* No. 5:14-371, 2015 WL 4603233, at *5 (E.D. Ky. July 29, 2015) (dismissing § 1681e(b) claim because allegations of inaccuracy did not demonstrate injury or causation); *Bailey v. Equifax Info. Servs.*, LLC, No. 13-10377, 2013 WL 3305710, at *5 (E.D. Mich. July 1, 2013) ("Plaintiff makes conclusory

---

[18] https://www.experian.com, Experian (last visited July 13, 2021).

allegations that the report is inaccurate and misleading. These allegations are insufficient."); *Johnson v. Experian Corp.*, No. 4:12-CV-609, 2013 WL 3282882, at *1 (E.D. Tex. June 27, 2013) (dismissing FCRA claim "because Plaintiff does not allege that an item of information in his credit report is inaccurate, which is a requirement of FCRA claims . . . "). Even accepting Sterling's version of events as true, the factual allegations are insufficient to state a claim for relief under § 1681e(b) because he has not alleged any inaccuracy in his consumer report.

### B. Fraud

Sterling's Complaint also asserts fraud generally against all consumer reporting agencies. (*See* Doc. No. 1-2). To establish a claim of fraud under Ohio law, there must be:

> (1) a representation or, where there is duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment, and; (6) a resulting injury proximately caused by the reliance.

*Aetna Cas. and Sur. Co. v. Leahey Constr. Co.,* 219 F.3d 519, 540 (6th Cir. 2000) (citing *Cohen v. Lamko, Inc.,* 462 N.E.2d 407, 409 (Ohio 1984)).

As best as I can determine, the crux of Sterling's fraud claim is that the score shown on Experian's website is not the same as the score in the consumer report provided to Huntington Bank. But Experian provides an explicit notice on its landing page that lenders could use different scoring models other than the FICO Score 8 utilized by Experian.[19] In the face of such clear notice as to the existence of other credit scoring models, Sterling's reliance on the online Experian credit score as his sole possible credit score was unjustified.

As to the specific allegations, Experian is identified by name in only three paragraphs. (*See* Doc. No. 1-2 at 3, ¶¶18-20). Each of these allegations relate to the score Experian reported either

---

[19] *See* https://www.experian.com, Experian (last visited July 13, 2021).

online or to Huntington Bank on or around September 30, 2019. But as discussed above, different scores, by themselves, are not evidence of inaccuracy or, in the context of Sterling's fraud claim, falsity. None of these allegations explain how the scores reported were false and thus, fail to meet Rule 9(b)'s pleading standard. *See Republic Bank & Trust Co.*, 683 F.3d at 247 (to satisfy Rule 9(b), plaintiff must explain how the statement is fraudulent).

Turning now to the collective fraud allegations against "Defendants," "credit bureaus," or "credit agencies," it is unclear to what extent Experian's conduct is implicated in these allegations. (Doc. No. 1-2 at 3-5, ¶¶ 21, 24, 27, 28, 34, 35; Statement of Claim). In the context of Rule 9(b)'s heightened pleading requirements, such collective pleading is generally impermissible because it does not adequately identify the circumstances surrounding each defendant's alleged wrongdoing. *See Jiaxi Hu v. Chan*, No. 1:15-CV-709, 2016 WL 4269065, at *6 (S.D. Ohio Aug. 15, 2016); *see also Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) ("A complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient [to meet Rule 9(b)'s particularity requirements].") (further citation omitted). Yet, even assuming Experian is the sole defendant implicated by these pleadings, these general and conclusory allegations do not provide Experian with "the minimum degree of detail necessary to begin a competent defense." *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008).

Rule 9(b) requires a plaintiff to plead "the time, place, and content of the alleged misrepresentation on which he or she relied . . . ." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003) (further citation omitted). Sterling's collective allegations do not specify any of these elements. For example, paragraph 21 states:

> Plaintiff alleges that the credit agencies are intentionally reporting fraudulent scores to keep the Plaintiff and likely other citizens from obtaining new loans even after repairing his credit for reasons yet to be revealed.

(Doc. No. 1-2 at 3).  Not only does this allegation fail to identify a relevant time frame for when this fraudulent activity occurred but it also lacks a description of where the misrepresentation was made, such as a website page or consumer report.  Even after inferring the time and place from the other allegations of the Complaint, the allegation is still deficient as there is no explanation as to why the credit score Experian reported was false.  For example, there are no allegations that Experian improperly calculated the score based on the information in his credit file or that Experian applied a different scoring model to Sterling's credit file than it advertises.  Without additional facts, merely stating the score is fraudulent lacks the necessary specificity to meet Rule 9(b)'s heightened pleading requirements.

Lastly, I decline to infer falsity of all credit scores based solely on Sterling's unsupported assertions of an industry-wide conspiracy to punish certain consumers.  *See Johnson v. Trans Union LLC*, Civil No. 12-5272, 2013 WL 1187063, at *1 (E.D. Pa. Mar. 22, 2013) (collecting cases in support of dismissing complaints which present "fantastical allegation[s]" or "surpass[ ] all credulity").  Even accepting the Complaint's allegations as true, Sterling has failed to meet the heightened pleading requirements of Rule 9(b) because he does not adequately plead the time, place, and content of any false statements by Experian.  In sum, he has not stated a plausible claim of fraud for which relief could be granted.

### C.  Leave to Amend Complaint

Also pending is Sterling's motion for leave to amend his Complaint.  (Doc. No. 74). Although leave to amend is often liberally granted, where, as here, the deadline for amending the complaint has already passed, "a plaintiff first must show good cause under Rule 16(b) for failure earlier to seek leave to amend before a court will consider whether amendment is proper under Rule 15(a)."  *Leary v. Daescher*, 349 F.3d 888, 909 (6th Cir. 2003).  "The primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management

12

order's requirements." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002) (further citation omitted). "In determining whether the 'good cause' standard is met, the district court must consider whether the amendment will prejudice the party opposing it." *Korn v. Paul Revere Life Ins. Co.*, 382 F. App'x 443, 449 (6th Cir. 2010).

If good cause under Rule 16 is shown, I must then evaluate the proposed amendment under Rule 15(a) which directs leave to "be freely given when justice so requires." Fed. R. Civ. P. 15(a). "Nevertheless, leave to amend 'should be denied if the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile.'" *Carson v. U.S. Office of Special Counsel*, 633 F.3d 487, 495 (6th Cir. 2011) (quoting *Crawford v. Roane*, 53 F.3d 750, 753 (6th Cir. 1995)). A motion for leave to amend may be denied for futility "if the court concludes that the pleading as amended could not withstand a motion to dismiss." *Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 767 (6th Cir. 2005) (citation omitted).

The deadline for amending the pleadings established in the case management order was April 16, 2020. (Doc. No. 20). Sterling did not file his motion to amend the Complaint until more than a year after this deadline had passed on June 21, 2021. (Doc. No. 74). In his motion and reply briefing, Sterling provides no justification or explanation for his failure to seek leave earlier and does not address the "good cause" standard. (*See* Doc. Nos. 74-1 & 76). Instead, he restates his allegations regarding an industry-wide fraudulent credit scoring scheme while also raising one new allegation regarding Experian's reinvestigation of a credit file remark at some unspecified time. (*Id.*).

Sterling has not met his burden of demonstrating good cause due to his lack of diligence in seeking amendment. *See Inge,* 281 F.3d at 625. Sterling initially filed his Complaint in December 2019, and despite being one of the named defendants, Experian was not served with the Complaint until May 4, 2021. By this time, the deadline to amend the pleadings had passed (April 16, 2020) and discovery was almost closed (May 17, 2021); yet, at no time in the preceding 17 months had Sterling

13

sought to amend his Complaint.  Throughout this period, Sterling actively participated in the

litigation, including exchanging discovery and negotiating settlements with the other Defendants.  It

was only after Experian moved to dismiss his Complaint that Sterling sought amendment.

Sterling's delay was not only lengthy but unexcused as the proposed amendment[20] does not

raise new facts or legal theories that could only have been learned after the deadline to amend had

passed.  *See Ross v. Am. Red Cross*, 567 F. App'x 296, 306 (6th Cir. 2014) ("A plaintiff does not

establish 'good cause' to modify a case schedule to extend the deadline to amend the pleadings

where [he] was aware of the facts underlying the proposed amendment to [his] pleadings, but failed,

without explanation, to move to amend before the deadline.").  The core of Sterling's proposed

amended Complaint remains the same – that consumer reporting agencies manipulate and defraud

consumers by providing consumers a credit score based off a particular model (in this instance,

FICO Score 8), while also offering lenders the ability to purchase consumer credit scores calculated

by utilizing different credit scoring models.

The only new allegation relates to Experian's response to a credit file inquiry regarding a

disputed debt, but Sterling does not provide specific dates or details regarding this exchange.  (*See*

Doc. 74-1 at 2).  In its opposition to the motion for leave, Experian asserts that this debt was

removed on August 29, 2019, and is no longer reflected in Sterling's credit file.  (Doc. No. 75 at 3,

fn.2).  Sterling does not contest either of these assertions in his reply.  (*See* Doc. No. 76).  Thus, it

appears Sterling was aware of the facts surrounding any alleged claim related to a credit file inquiry

well before he initiated this litigation.  This assumption is also supported by the fact that Sterling and

Experian have not exchanged any discovery, so the factual basis for new allegations were either

already known by Sterling or learned over the course of the litigation but not timely acted upon.  *See*

---

[20] Sterling's motion for leave to amend did not include a proposed Amended Complaint outlining
the amendments or new allegations, so I have distilled likely allegations from the narrative in the
memorandum supporting his motion.  (*See* Doc. No. 74-1).

*Leary*, 349 F.3d at 909 (finding plaintiffs did not show good cause where they were "obviously aware of the basis of the claim for many months, but nonetheless failed to pursue the claim until after it was brought to their attention by [defendant's motion].") (internal quotation marks and further citation omitted). Sterling's lack of diligence in moving to amend prior to the expiration of the deadline (or any other time in the following year) does not support a finding of good cause.

While a movant's diligence is the touchstone of the Rule 16 analysis, the presence or absence of prejudice to the non-movant is also a consideration. *See, e.g., Amos v. PPG Indus., Inc.*, No. 2:05-CV-70, 2015 WL 13757306, at *4 (S.D. Ohio May 15, 2015) ("The focus is primarily upon the diligence of the movant; the absence of prejudice to the opposing party is not equivalent to a showing of good cause."); *Korn*, 382 F. App'x at 450 ("Even if the Court were to agree that an amendment would not have prejudiced [non-movant], prejudice to [non-movant] is merely a consideration that informs whether [movant] has satisfied the 'good cause' requirement of the *Leary* standard.").

Procedurally, Sterling's case against Experian is still in its early stages such that amendment at this point would not create apparent prejudice to Experian. But the sole reason the case has not progressed is due to Sterling's own failure to properly serve Experian at the time of initial filing. It hardly seems equitable that Sterling's lack of diligence in litigating his case against Experian can now be used as a shield against a finding of prejudice. *See Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792, 807 (6th Cir. 2005) ("Delay, however will become 'undue' at some point, placing an unwarranted burden on the court, or 'prejudicial', placing an unfair burden on the opposing party.") (internal quotation marks and further citation omitted). Even so, Sterling only requested leave to amend after Experian filed a motion to dismiss identifying the deficiencies of the Complaint. Sterling's reply in support of his motion for leave indicates an intent to re-formulate his previous allegations to address Experian's arguments. (*See* Doc. No. 76 at 2). This is prejudicial to Experian.

15

*See Hometown Folks, LLC v. S&B Wilson, Inc.,* No. 1:06-CV-81, 2007 WL 3069639, at *5 (E.D. Tenn. Oct. 18, 2007) (noting the prejudice where proposed amendment was in attempt to circumvent defendant's motion for summary judgment).

Ultimately, the delays in this case are solely attributable to Sterling and the prejudice to Experian, while not overwhelming, is demonstrable.  Thus, Sterling has failed to carry his burden of establishing good cause under Rule 16.  *See Bridgeport Music,* 410 F.3d 792 (affirming denial of motion for leave to amend on grounds of unjustified delay and in absence of finding of prejudice).  These findings of undue delay and prejudice are also relevant, and apply in equal force, to the Rule 15(a) analysis.

Even if I found that Sterling had good cause for his failure to seek amendment earlier, his motion for leave to amend his Complaint would be denied as futile under Rule 15(a).  While Sterling did not provide a proposed Amended Complaint, his briefing in support of the motion indicates he plans to re-state his criticisms of the multi-model credit scoring system.  (*See* Doc. Nos. 74-1 & 76). As already discussed, this theory does not state a plausible claim for relief.

Put simply, there is no statutory requirement for Experian to calculate credit scores using the same models as other consumer reporting agencies or lenders, and the decision to do so is not fraudulent.  *See* § 1681g (f)(1) ("Upon request of a consumer for a credit score, a consumer reporting agency shall supply to the consumer a statement indicating that the information and credit scoring model may be different than the credit score that may be used by the lender . . ."). Thus, permitting an amendment that re-asserts the same defective argument and will not withstand a motion to dismiss would be futile.  *Midkiff,* 409 F.3d at 767.

To the extent Sterling seeks to bring forth a new claim under § 1681i for Experian's reinvestigation of a disputed credit file entry, amendment would also be futile.  Sterling's briefings provide an over-simplified version of the details surrounding this alleged violation.  Particularly,

16

Sterling fails to state the date he became aware of and then disputed the remark, with whom he disputed the remark (the debt reporter or Experian), and the results of that dispute. Regardless, Experian asserts Sterling requested a credit file inquiry on June 28, 2019, and the debt was removed from his file on August 29, 2019. (Doc. Nos. 75 at 3, fn.2). Sterling does not contest these assertions. (*See* Doc. No. 76). This is important because "[t]o state a claim under § 1681i, a plaintiff must also demonstrate that [he] suffered damages proximately caused by the defendant's violation of that provision." *Alexander v. Experian Info. Sols., Inc.,* No. 3:06CV00067, 2007 WL 9783239, at *9 (M.D. Tenn. Apr. 12, 2007).

If it is undisputed that this debt was no longer reflected on Sterling's credit file as of August 29, 2019, it could not have had any effect on Huntington Bank's decision to deny Sterling a home mortgage when it requested his consumer report from Experian on September 30, 2019. As there is no causal relationship between Sterling's alleged violation and the damages he claims, it would be futile to permit amendment. *Midkiff,* 409 F.3d at 767.

## IV. CONCLUSION

For the reasons stated above, I find Sterling's Complaint fails to allege sufficient facts to demonstrate a plausible claim for relief. Furthermore, Sterling has not shown the good cause necessary under Rule 16 to allow for amendment of his Complaint outside of the established deadline. Even if he had, I would deny his motion for leave to amend his Complaint as futile. While Sterling's aim of a simplified and more transparent credit scoring system may be laudable, he cannot achieve that aim through this judicial action. I therefore deny Sterling's motion for leave to amend his Complaint, (Doc. No. 74), and grant Experian's motion to dismiss pursuant to Rule 12(b)(6). (Doc. No. 73).

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge

17